```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HELEN E. HENDERSON, et al.     :     CIVIL ACTION
                               :
     v.                        :
                               :
JUSTIN MATTHEWS, et al.        :     NO. 19-3040
```

MEMORANDUM

Bartle, J.                                          November 9, 2020

      Plaintiffs Helen Henderson and her son, Ramil Hughes, bring this action under 42 U.S.C. § 1983 against Philadelphia Police Officers Justin Matthews, Marcus Baker, and former Philadelphia Police Officer Brandon Pinkston ("defendants") for violations of their rights under the First, Fourth, Eighth, and Fourteenth Amendments.[1]  Among other claims, plaintiffs specifically allege:  (1) First Amendment retaliation for complaining of police misconduct; (2) equal protection violation (selective treatment); (3) excessive force in violation of the Fourth Amendment; and (4) false arrest.  Before the court is the motion of defendants for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

---

[1] The City of Philadelphia was also named as a defendant. The Court has dismissed the city for failure to state a claim upon which relief can be granted.  See Henderson, et al. v. Matthews, et al., Civil Action No. 19-3040 (E.D. Pa. April 29, 2020).

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004). Summary judgment is granted where there is insufficient record evidence for a reasonable fact finder to find for the non-movant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id.

II

The following facts are undisputed or taken in light most favorable to plaintiffs. On February 10, 2018 at 3:45 a.m., plaintiff Helen Henderson called the Philadelphia Police Department to request that police remove Alisha Henderson, her son's girlfriend and her homecare aide, from her home. Matthews

and Baker arrived at Helen Henderson's house and ordered Alisha Henderson to leave. At around 4:22 a.m., police were alerted a second time of a disturbance at the home of Helen Henderson. Matthews, Baker, and Pinkston arrived at the scene and observed Alisha Henderson lying motionless on the floor, surrounded by blood. Officers Eric Miller and Samira Rasheed had arrived earlier and were also inside the home, attending to Alisha Henderson. Helen Henderson was not present in the house when the officers arrived. The officers then put Alisha Henderson in an ambulance so that she could receive medical care.

When the officers arrived at the scene, they encountered plaintiff Helen Henderson's son, plaintiff Hughes, inside of the home with blood on his shirt. He stated to the officers, "look what my mom did to my girl." The officers handcuffed Hughes because he was upset, had blood on his clothes, and it was not clear what transpired or if Hughes was involved in the attack. After he was questioned and calmed down, the officers removed Hughes's handcuffs.

Sometime thereafter, Baker observed Helen Henderson exit the home of a neighbor, located at 5150 Reno St. She confessed to striking Alisha Henderson over the head with a bottle of wine. After her confession, Helen Henderson was handcuffed and taken into custody for aggravated assault.

Miller then transported Hughes to the Southwest Detective Division for further questioning. During his interview with Detective McDermott, Hughes stated that after the officers left the first time, Helen Henderson let Alisha Henderson back into the house, and they began arguing. At some point, Hughes went to the bathroom and when he came out, Alisha Henderson was on the floor bleeding and his mother, Helen Henderson, was missing.

Following her arrest around 5:30 a.m., Helen Henderson was taken to the Penn Presbyterian Medical Center emergency department under police custody. During her medical examination, she admitted to consuming half a gallon of rum during the day before the altercation with Alisha Henderson and being under the influence of marijuana. Her medical records disclosed that she also "mention[ed] right foot pain." At 8:10 a.m., an x-ray of Helen Henderson's right foot showed a "spiral fifth metatarsal fracture." An orthopedic examination and additional x-rays showed a "mildly comminuted spiral fracture through the fifth metatarsal shaft with minimal medial and dorsal displacement of the distal fracture fragment." As a result, Helen Henderson was placed in a "non-weight-bearing cast with crutches" and was given "aspirin for DVT prophylaxis."

Helen Henderson testified that she had hired Alisha Henderson to "care for [her], wash clothes, run errands, do

[her] hair, [and] prepare [her] food" through the "First Staff" government program. She also testified that she has: "a problem with falling"; "issues with [her] memory"; and "suffers from postpartum depression."

### III

We first turn to plaintiff Hughes's false arrest claim against Baker and Pinkston. Hughes claims that he was arrested and handcuffed twice on February 10, 2018. He does not challenge his first arrest, but contends that the second time he was handcuffed, it was a false arrest because he was:

> handcuffed after it was determined he was not a suspect to any crime, he had already provided information to the police they requested, [and] he in no way interfered with the police investigation or created any risk of physical injury to anyone.

Defendants deny that Hughes was arrested or handcuffed a second time. Defendants argue that summary judgment should be granted with respect to Hughes's false arrest claim because he has been inconsistent in identifying which officer arrested him the second time. Defendants maintain that based on the undisputed evidence, no reasonable jury could find that either Baker or Pinkston falsely arrested Hughes.

We first address Hughes's false arrest claim against Baker. Plaintiffs first filed their complaint against defendants on July 12, 2019. The original complaint did not

-5-

allege a false arrest claim against any of the defendants.  A few months later, during his deposition on December 19, 2019, Hughes testified that he was handcuffed a second time and the officer who handcuffed him was "the other African American officer.  It wasn't Pinkston this time."  Subsequently, plaintiffs filed an amended complaint on February 13, 2020, which stated, in relevant part:

> Defendant Baker arrested and handcuffed Plaintiff Hughes for a substantial period of time the second time he was handcuffed February 10, 2018 without probable cause or due to needs of investigation safety or any other legitimate law enforcement interest.

See Doc. # 18.  On July 1, 2020, plaintiffs filed a motion for leave to file another amended complaint in which they continued to allege that Baker arrested Hughes the second time.  The court denied plaintiffs' motion for leave to file a second amended complaint on August 25, 2020 for reasons that had nothing to do with the allegations against Baker.  See Doc. # 75.

Discovery proceeded and plaintiffs filed a partial motion for summary judgment on September 11, 2020 and defendants filed their motion for summary judgment on September 14, 2020.  In their motion for partial summary judgment, plaintiffs reiterated that Baker arrested Hughes the second time.

Nevertheless, on October 2, 2020, Hughes submitted a signed affidavit dated October 1, 2020 as an exhibit to

plaintiffs' response to defendants' motion for summary judgment. In that affidavit he swore, "Pinkston later handcuffed me a second time." Hughes provided no explanation for this sudden change refuting his allegations against Baker. On October 29, 2020, Hughes submitted another affidavit dated October 21, 2020, this time stating that his previous recollection at his deposition that "it wasn't Pinkston" who arrested him a second time, "was a mistake" and that "now [he] want[s] to tell the truth."

It is undisputed that through these two affidavits, Hughes admits that Baker did not arrest him a second time. Indeed, Hughes states, "Baker did not handcuff me." The court will grant the motion of defendant Baker for summary judgment on Hughes's false arrest claim based on the ground that Hughes now admits that Baker did not arrest him the second time.

With respect to Pinkston, Hughes's affidavit dated October 1, 2020 is the first time plaintiffs claim that Pinkston falsely arrested Hughes the second time. This is a significant change of material fact and directly contradicts Hughes's testimony that, "it wasn't Pinkston this time." Our Court of Appeals has held that, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict. Hackman v. Valley

-7-

Fair, 932 F.2d 239, 241 (3d Cir. 1991). When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the "alleged factual issue in dispute can be perceived as a sham, thereby not creating an impediment to a grant of summary judgment based on the deposition." See Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (internal quotations and citations omitted). The "sham affidavit" doctrine refers to a trial courts' "practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." Id. (Internal quotations and citations omitted).

Here, Hughes provided no explanation for this contradictory change of material fact when he submitted his affidavit. Only after this was pointed out by defendants in their response, on October 29, 2020, Hughes filed another affidavit dated October 21, 2020, stating that his previous recollection at his deposition "was a mistake" and that "now [he] want[s] to tell the truth." We are not convinced. Plaintiffs waited far too long to seek to amend their complaint and provide no reasonable explanation for their undue delay. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for

screening out sham issues of fact." Id. (quoting Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 577–78 (2d Cir. 1969)). We deem Hughes's affidavit to be a sham. Thus Hughes has no claim against Pinkston.[2]

IV

We turn next to plaintiffs Helen Henderson and Ramil Hughes's First Amendment retaliation claim. The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). To prevail on a § 1983 First Amendment retaliation claim, plaintiff must prove that: (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action. Palardy v. Twp. of Millburn, 906 F.3d 76, 80-81 (3d Cir. 2018) (internal quotations omitted).

Defendants argue that this court should grant summary judgment in their favor on the First Amendment retaliation issue

---

[2] On November 4, 2020, this court denied the motion of plaintiffs for leave to file a second amended complaint alleging that Pinkston and not Baker handcuffed Hughes the second time. It did so on the ground that plaintiffs did not meet the standard for relation back set forth under Rule 15(c) of the Federal Rules of Civil Procedure. See Doc. # 95.

-9-

because plaintiffs have failed to demonstrate that they engaged in a protected activity at the time of the alleged retaliatory conduct or that defendants were motivated by retaliatory animus. According to defendants, plaintiffs have "set forth zero instances" where they had protested police misconduct or otherwise engaged in protected speech.

Plaintiffs counter that they were retaliated against because they both complained to the officers about the way the investigation into the altercation between Helen Henderson and Alisha Henderson was handled. Plaintiffs maintain that they were arrested because the officers wanted to "retaliate against [them], silence [them], cover up their excessive force[,] and intimidate [them]."

With respect to Helen Henderson's First Amendment retaliation claim, it is undisputed that when police officers arrived at her home the second time, they found Alisha Henderson lying in a pool of her own blood. It is also undisputed that when officers encountered Helen Henderson at her neighbor's house, she confessed to hitting Alisha Henderson over the head with a wine bottle. There is simply no evidence in the record that Helen Henderson's arrest was motivated by any reason other than the fact that she had "just smashed a wine bottle over another woman's head, knocking her unconscious." The court will grant the motion of defendants for summary judgment in

their favor as to Helen Henderson's claim for First Amendment retaliation.

With respect to Hughes's First Amendment retaliation claim, it is based on his allegation that Baker arrested him the second time. As discussed above, Hughes admits that Baker did not arrest him the second time. As a result, the motion of defendants for summary judgment in their favor as to Hughes's claim for First Amendment retaliation will be granted.

V

Defendants also seek summary judgment on Helen Henderson's claim of selective treatment in violation of the equal protection clause. The equal protection clause of the Fourteenth Amendment prohibits the discriminatory enforcement of facially valid laws. See Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). To establish a selective-enforcement claim, a plaintiff must demonstrate: (1) that she was treated differently from other similarly situated individuals, and (2) that her selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, or to prevent the exercise of a fundamental right. Dique v. N.J. State Police, 603 F.3d 181, 184 n.5 (3d Cir. 2010).

The first element, which is "an essential element of a claim of selective treatment under the Equal Protection Clause,"

requires a plaintiff to present evidence that similarly situated parties were treated differently than she was.  See Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008).  "Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects."  Id. (Internal citations and quotations omitted).

Defendants maintain that Helen Henderson has failed to adduce any evidence of different treatment of similarly situated individuals, or evidence of an unjustifiable standard necessary for her equal protection claim.  Defendants argue that there was "disparate treatment" between Helen Henderson and Alisha Henderson (one was arrested and the other was sent to the hospital) because of the "physical conditions of the [two] parties," not some form of selective treatment.

Plaintiffs contend that Alisha Henderson and Helen Henderson were similarly situated as both were "suspected of a crime in a physical fight with another" but were treated differently.  According to plaintiffs, "Alisha Henderson was the aggressor . . . [and] there was probable cause to charge [Alisha Henderson] with aggravated assault," and the officers "refused to do any on the scene investigation."

As noted above, the undisputed facts establish that Helen Henderson had smashed a wine bottle on Alisha Henderson's head and police found Alisha Henderson lying on the floor "in a

-12-

pool of her own blood." It is also undisputed that Alisha Henderson needed immediate medical care. Helen Henderson on the other hand, had no visible injuries when police first encountered her at her neighbor's house.

Even if Helen Henderson had successfully alleged selective treatment, which she has not, there is no evidence that her selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor to prevent the exercise of a fundamental right. Indeed, both individuals identify as African American women.

Accordingly, the court will grant the motion of defendants for summary judgment in their favor on the issue of selective treatment in violation of the equal protection clause of the Fourteenth Amendment.

VI

Finally, there is Helen Henderson's excessive force claim against the defendants. A claim that a police officer used excessive force during a seizure is "properly analyzed under the Fourth Amendment's objective reasonableness standard." Graham v. Connor, 490 U.S. 386, 388 (1989). While "the reasonableness of an officer's actions is a pure question of law," we can only move to that analysis at the summary judgment stage "once we identify the relevant facts and draw all

inferences in the non-movant's favor." Johnson v. City of Philadelphia, 837 F.3d 343, 349 (3d Cir. 2016).

We first address the excessive force claim against Baker. The operative amended complaint (Doc. # 18) alleges that:

> Defendants Matthews, Pinkston and/or Baker used excessive force against Plaintiff HH in their arrest and capture of her not reasonably necessary under the circumstances and caused her very serious physical injury.

Plaintiffs contend that since the Arrest Report states that Baker answered the call, showed up at Helen Henderson's house, and was present during the arrest, a reasonable jury can infer that he was involved in the "physical apprehension" of Helen Henderson. This is mere speculation. There is no evidence that identifies Baker as using excessive force against Helen Henderson. Indeed, plaintiffs' own eyewitness, Hughes, does not identify Baker as one of the officers who "pulled" his mother down the steps of their neighbor's home. Aside from the conclusory allegation in the complaint stated above, there is no evidence to suggest otherwise. The motion of defendant Baker for summary judgment will be granted with respect to the excessive force claim.

Helen Henderson also contends that Matthews and Pinkston used excessive force when they arrested her and caused

her to suffer a broken foot.  According to the amended
complaint, the officers:

> Very quickly without warning-without
> attempting to first handcuff plaintiff
> [Helen Henderson]-grabbed her, each one
> grabbing one arm or hand, forcefully
> hurrying her walking forward, using so much
> unnecessary force that they caused her to
> fall on stairs as they escorted her, and
> suffer a mildly comminated [sic] spiral
> fracture through the fifth metatarsal shaft
> of her right foot with medial and dorsal
> displacement of the distal fracture fragment
> and suffer an injury to her back.

Helen Henderson testified at her deposition that she did not recall which officers arrested her.  She did remember that after she was escorted out of her neighbor's house, she "blank[ed] out . . . until [she] felt pain . . . in [her] foot . . . and [she] couldn't get up and [the officers] had to pick [her] up." Hughes testified that he was standing outside when he witnessed Matthews and Pinkston "yanking" and "pulling" Helen Henderson down the steps of their neighbor's house.  He saw her fall and watched Matthews and Pinkston carry her to the police car because she was unable to walk properly.  He testified that he could hear Helen Henderson complain of pain.  He also heard Pinkston ask Matthews, "what did you hit her with?"

Defendants present conflicting evidence. Specifically, there is inconsistent testimony on the crucial questions of:  (1) whether Matthews and Pinkston physically

apprehended Helen Henderson on February 10, 2018; (2) if they did, whether they used excessive force; and (3) if excessive force was used, whether it was the cause of Helen Henderson's foot fracture.  Genuine disputes of material fact exist as to these important questions and a reasonable jury could find for the nonmovant.[3]

The motion of defendants Matthews and Pinkston for summary judgment on the excessive force claim will be denied.

---

[3]  Under the circumstances, defendants' claim of qualified immunity is without merit.