IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| HELEN E. HENDERSON | : | CIVIL ACTION |
|---|---|---|
| V. | : | |
| JUSTIN MATTHEWS, et al. | : | NO. 19-3040 |

MEMORANDUM

Bartle, J.   May 20, 2021

Helen E. Henderson (hereinafter referred to as "Helen" or "plaintiff") claims that defendants Philadelphia Police Officers Justin Matthews and Brandon Pinkston used excessive force against her on February 10, 2018 in violation of 42 U.S.C. § 1983.[1] Plaintiff asserts that the defendants pulled her down several steps during her arrest causing her to fall and fracture her right foot. Before the court is the motion in limine of plaintiff to preclude the testimony of defendants' expert, podiatrist Dr. Michael A. Troianio, under Rule 702 of the Federal Rules of Evidence. Dr. Troianio opines that plaintiff fractured her foot not during her arrest but during a physical altercation with her son's girlfriend less than an hour before she was arrested.

---

1. Helen's son, Ramil Hughes, was also a plaintiff in this action. Helen and Ramil Hughes asserted claims against a third Philadelphia Police Officer, Marcus Baker. The court granted summary judgment in favor of the defendants on all claims brought by Hughes. The court also granted summary judgment against plaintiffs on all claims against Baker. Neither Hughes nor Baker remains a party to this action.

I

The discovery in this case includes conflicting accounts of plaintiff's arrest.  The following facts, except where noted, are either undisputed or relied upon by Dr. Troianio in his expert report.

Early in the morning of February 10, 2018, Helen called the Philadelphia Police Department.  She requested that police remove her son's girlfriend Alisha Henderson (hereinafter referred to as "Alisha") from her house.  The two women had been in an argument.  Police officer Justin Matthews and his partner Marcus Baker arrived at Helen's house at approximately 3:45 a.m. and instructed Alisha to leave.  Alisha left but returned shortly thereafter.  Helen called the police again.

At 4:22 a.m., defendant Matthews and his partner Baker responded to the call with two other officers, Rasheed and Miller.  Defendant police officer Brandon Pinkston responded a while later.  Before police arrived at Helen's house this second time, her confrontation with Alisha had escalated into a violent physical altercation.  Matthews and Baker saw Alisha motionless on the floor of Helen's house when they arrived.  She was surrounded by blood.  Officers Rasheed and Miller were already inside attending to her.  In the meantime, Helen had gone to a neighbor's row house a few doors away and was not in her own house at the time.

Alisha, who is significantly younger and heavier, had pinned Helen to the ground by laying on top of her. Helen was unable to breathe. To break free, she reached for a wine bottle and smashed it over Alisha's head. Helen's son, Ramil Hughes, witnessed the end of the altercation. He testified:

> I noticed Alisha on top of my mother. . . . Kind of like strangling her and trying to yank at her hair. . . . it looked like a fight to the death if you want me to be more descriptive. It was just blood everywhere and two females tussling. I didn't know where it was coming from.

Plaintiff does not dispute the fight occurred. She testified:

> **Q.** So you were tired of her being in there, you hit her and said it was time to go?
>
> **A.** Yeah. This was going on all night long.
>
> **Q.** And then she jumped on you?
>
> **A.** Yes.
>
> **Q.** Then what happened?
>
> **A.** I couldn't get her off me and I seen the bottle, I looked behind her, I seen the bottle and smacked her in the head with it. That's the only way I could get her to stop choking me.

Plaintiff admitted to drinking a half gallon of rum and using marijuana prior to the altercation.

The testimony of the responding officers, including the defendants, about the events surrounding Helen's arrest is largely contradictory. However, there is no dispute that police

arrested Helen and removed her from her neighbor's house which had a number of front steps. There is also no dispute that police brought Helen to the emergency room at Penn Presbyterian Medical Center where she received an x-ray and was diagnosed with a spiral fracture to the fifth metatarsal of her right foot which is a short distance behind the small toe on the outside of the right foot.

The basis of Helen's excessive force claims is that defendants Matthews and Pinkston pulled her down the steps in front of her neighbor's house which caused her to fall and break her right foot. Helen testified she blacked out repeatedly the morning of her arrest. She remembers only stopping on the steps to adjust her footing, blacking out, and then being carried to a police vehicle. However, her son Hughes testified that he witnessed defendants Matthews and Pinkston violently pull his mother down several of the steps. According to Hughes, this caused Helen to fall as the defendants brought her to a police vehicle. Hughes testified plaintiff fell:

> Almost immediately. The grab was aggressive, ferocious. It was nothing she could have tried to struggle or, you know, yank back in time for. It was quick.

Hughes further testified:

> she went down at least four steps without touching [the steps]. And when she came down on the landing, would be the pavement. She

> automatically crumbled to the ground until her knees hit the pavement.

After the fall, according to Hughes, defendants Matthews and Pinkston:

> commanded [plaintiff] to try to walk, but she couldn't, . . . Every time she tried to put her foot on the ground after that, she would kind of like crumble in a non-supportive way.

Hughes testified the defendants then carried plaintiff to a police car.

In contrast, defendant Matthews testified neither he nor Pinkston escorted Helen down the steps. Rather, she walked down the steps on her own and was handcuffed by officer Rasheed at the bottom. Defendant Pinkston does not recall whether he was ever at plaintiff's neighbor's house.

Defendants offer the testimony of Dr. Troianio to dispute the cause of the fracture to plaintiff's foot. He will opine that the spiral fracture plaintiff experienced is not consistent with falling from a height and landing violently as Hughes described. Rather, a spiral fracture is consistent with a twisting injury that occurs during a struggle. Dr. Troianio concludes that it is "most likely" that plaintiff injured her foot during the altercation with Alisha. He intends to testify that Helen likely planted her foot on the ground and twisted violently when trying to remove Alisha from on top of her.

Dr. Troianio states in his report that Helen did not complain of pain in her foot until 7:00 a.m. when she reported it to medical staff at Penn Presbyterian Medical Center.[2] He explains that this delay in reporting pain resulted from the delay in her ability to feel the pain because of the adrenaline, noradrenaline, marijuana, and excessive amount of alcohol in plaintiff's system. Once plaintiff's "sympathetic nervous system response coalesced" and "her blood alcohol level decreased" she was able to realize that she had a broken foot. Dr. Troianio provides this explanation to account for the time that passed between 4:25 a.m. when he opines plaintiff broke her foot and 7:00 a.m. when she first reported the pain to hospital staff.

## II

Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

2. Plaintiff testified she does not remember whether or when she reported any foot pain to police. An incident report completed by police states that she reported feeling pain in her foot at 6:00 a.m. Officer Baker testified that he was told about plaintiff's broken foot at 5:28 a.m.

>    (b) the testimony is based on sufficient
>    facts or data;
>
>    (c) the testimony is the product of
>    reliable principles and methods; and
>
>    (d) the expert has reliably applied the
>    principles and methods to the facts of the
>    case.

This Court has the role of "gatekeeper" in connection with the admission of expert testimony. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997); see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

Rule 702 has "three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). Our Court of Appeals has explained that these three requirements embody "a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Est. of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). Plaintiff accepts the qualifications of Dr. Troianio and the fit of his testimony. She disputes only reliability.

An expert's opinion is reliable if it is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." Schneider, 320 F.3d at 404.

The test for reliability is "a flexible one." Daubert, 509 U.S. at 594. In making a reliability determination, the Court may but is not required to consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48.

The party seeking to introduce expert testimony has the burden to show by a preponderance of the evidence that requirements for the admissibility of expert testimony are met. See In re Paoli R.R. Yard Pcb Litig., 35 F.3d 717, 744 (3d Cir. 1994).

III

Plaintiff references testimony or documentation produced during discovery which she contends contradicts the facts Dr. Troianio relied on to form his opinion. Plaintiff appears to argue Dr. Troianio's testimony is inadmissible under Rule 702 on the ground that contradictory facts in the discovery record render his opinion unreliable.

The Court's "gatekeeper" function is limited to determining whether expert testimony is admissible. See Heller v. Shaw Indus., Inc., 167 F.3d 146, 157 (3d Cir. 1999). It is important the court "take care not to mistake credibility questions for admissibility questions." Id. Though we may exclude an expert's opinion if it is based on inadmissible evidence or otherwise legally insufficient facts, see Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1314 (Fed. Cir. 2014), the court does not weigh facts to evaluate the correctness of the expert's conclusions. Id. This is a task reserved for the jury. Id.

Dr. Troianio opines that Helen broke her foot during her altercation with Alisha and not as a result of her arrest. To come to this conclusion, he relies on x-rays of Helen's foot, her medical records, her son Hughes' testimony describing her fall on the steps, and the undisputedly violent confrontation she had with Alisha. Dr. Troianio also relies on Hughes' description of what he saw of that confrontation. This discovery is sufficient to raise a genuine factual dispute as to whether Helen broke her foot during her physical altercation with Alisha and not as a result of the arrest. We leave it to the jury to weigh the evidence relied on by Dr. Troianio and to determine the credibility of his opinion.

Dr. Troianio also opines that the adrenaline, noradrenaline, marijuana, and excessive amount of alcohol in plaintiff's system explains the time gap between the altercation at 4:25 a.m. and her first complaining of pain at 7:00 a.m. To come to this conclusion, Dr. Troianio relies on Hughes' description of plaintiff's confrontation with Alisha, plaintiff's admission that she drank a half gallon of rum and used marijuana before the altercation, and a medical record of plaintiff showing she complained to emergency room staff of foot pain at 7:00 a.m.

Plaintiff disputes the reliability of Dr. Troianio's testimony in this regard by referencing an incident report in which police stated plaintiff reported foot pain at 6:00 a.m. Plaintiff also references officer Baker's testimony that he found out about plaintiff's broken foot from emergency room staff at 5:28 a.m. Even if we were to accept as a matter of law that plaintiff reported foot pain as early as 5:28 a.m., this does not preclude a jury from crediting Dr. Troianio's opinion that she fractured her foot in the tussle with Alisha around 4:25 a.m.

Plaintiff also moves to preclude Dr. Troianio's testimony as unreliable on the ground that he does not reference any scientific studies or literature or perform any tests to support his conclusions that: (1) the spiral fracture plaintiff

experienced is inconsistent with the fall described by Hughes, and (2) the adrenaline, noradrenaline, marijuana, and excessive amount of alcohol in plaintiff's system explains why she did not appreciate her broken foot until well after the altercation with Alisha.

A physician is not required to cite to or perform studies to support his or her opinion as to the cause of an injury. <u>Heller</u>, 167 F.3d at 157. Physicians proffering expert testimony may rely on knowledge of the causes of certain injuries gained through their experience treating the injuries. <u>See id.</u> As our Court of Appeals stated in Heller:

> In the actual practice of medicine, physicians do not wait for conclusive, or even published and peer-reviewed, studies to make diagnoses to a reasonable degree of medical certainty. Such studies of course help them to make various diagnoses or to rule out prior diagnoses that the studies call into question. However, experience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of a patient's family, personal, and medical histories, and thorough physical examinations are the tools of the trade, and should suffice for the making of a differential diagnosis even in those cases in which peer-reviewed studies do not exist to confirm the diagnosis of the physician.

<u>Id.</u>

Dr. Troiano is a doctor of podiatric medicine and a board-certified foot and ankle surgeon. He reviewed

plaintiff's x-rays and medical records from Penn Presbyterian Medical Center and medical records from her treating podiatrist. Relying on his 14 years of experience as a podiatrist treating injuries such as plaintiff's Dr. Troiano opines that the type of fracture she suffered is not consistent with the fall Hughes described. He has determined that the pain plaintiff would have felt as a result of the type of injury she suffered was delayed due to the adrenaline, noradrenaline, marijuana, and alcohol in her system. That he relied on his experience as a physician treating the type of injury plaintiff experienced as opposed to citing to peer reviewed studies does not render his testimony unreliable under Rule 702. See Heller, 167 F.3d at 157. It is the court's view that Dr. Troiano's opinion is the product of reliable principles and methods properly applied to facts supported by the record.

The court will deny the motion of Helen E. Henderson to preclude the evidence of podiatrist Dr. Michael A. Troianio as inadmissible under Rule 702 of the Federal Rules of Evidence.