IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HELEN E. HENDERSON | : | CIVIL ACTION |
| | : | |
| V. | : | |
| | : | |
| JUSTIN MATTHEWS, et al. | : | NO. 19-3040 |

<u>MEMORANDUM</u>

Bartle, J.                                      November  4, 2021

        Helen Henderson sued Philadelphia police officers
Justin Matthews and Brandon Pinkston under 42 U.S.C. § 1983 for
use of excessive force when they arrested her.  After a five-day
trial, a jury returned a verdict in favor of Matthews and
Pinkston.[1]  Henderson now moves for a new trial under Rule 59 of
the Federal Rules of Civil Procedure and for relief from
judgment under Rule 60.  She argues that newly discovered
evidence exists, various rulings at trial constitute reversible
error, and the jury's verdict was against the weight of the
evidence.

I

        The court has discretion to grant or deny a motion for
a new trial under Rule 59 of the Federal Rules of Civil

---

1.    Helen Henderson's son, Ramil Hughes, was also originally a
plaintiff in this action.  Henderson and Hughes asserted claims
against a third Philadelphia Police Officer, Marcus Baker.  The
court granted summary judgment in favor of the defendants on all
claims brought by Hughes.  The court also granted summary
judgment against plaintiffs on all claims against Baker.
Neither Hughes nor Baker remains a party to this action.

Procedure.  Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006).
The court may grant a motion for a new trial under this rule
"for any reason for which a new trial has heretofore been
granted in an action at law in federal court."  Fed. R. Civ. P.
59(a)(1)(A).  Courts have granted new-trial motions when "there
is a significant error of law, to the prejudice of the moving
party," "the verdict is against the weight of the evidence," or
"counsel engaged in improper conduct that had a prejudicial
effect on the jury."  Borrell v. Bloomsburg Univ., 207 F. Supp.
3d 454, 470 (M.D. Pa. 2016) (citation omitted).  The court need
not view the evidence in the light most favorable to the verdict
winner.  See, e.g., Taha v. Bucks Cty., 408 F. Supp. 3d 628, 643
(E.D. Pa. 2019); Magee v. Gen. Motors Corp., 213 F.2d 899, 900
(3d Cir. 1954).  Still, a new trial should be granted only when
"a miscarriage of justice would result if the verdict were to
stand."  Springer, 435 F.3d at 274 (citation omitted).

Rule 60(b) of the Federal Rules of Civil Procedure
permits the court to issue relief from a final judgment, order,
or proceeding.  The Rule provides several reasons for which the
court may relieve a party from a final judgment.  The present
motion advances two:  "newly discovered evidence that, with
reasonable diligence, could not have been discovered in time to
move for a new trial under Rule 59(b)" and "fraud (whether
previously called intrinsic or extrinsic), misrepresentation, or

misconduct by an opposing party." Fed. R. Civ. P. 60(b)(2), (3). Relief under Rule 60(b) "should be granted only where extraordinary justifying circumstances are present." Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991) (citation omitted).

II

In the early morning hours of February 10, 2018, police twice visited the 5100 block of Reno Street in Philadelphia. At approximately 3:45 A.M. Matthews and his partner Marcus Baker responded to a call over police radio to Henderson's home at 5138 Reno Street. When they arrived, Henderson was arguing with her son Ramil Hughes and her son's girlfriend Alisha Henderson ("Alisha"), who is not related to plaintiff Henderson. Henderson and Alisha appeared visibly intoxicated. Alisha left the house, and the officers departed.

Matthews and Baker received a radio call about another disturbance at 5138 Reno Street at 4:22 A.M. They responded along with officers Samira Rasheed and Eric Miller. Alisha had returned to Henderson's house and had begun arguing with Henderson again. The altercation turned violent. Alisha, who is significantly younger and heavier than Henderson, pinned Henderson to the ground by lying on top of her. Henderson was unable to breathe. She was able to reach a bottle of wine and smashed it over Alisha's head. At some point during the fight, Henderson cut her finger. When officers first reached the

-3-

scene, they found Alisha lying motionless on the floor, surrounded by blood.  By this time, Henderson had walked to the home of her neighbor, Lanett Parrish, at 5150 Reno Street.

The officers learned of Henderson's whereabouts and proceeded to that address.  She confessed to striking Alisha with the bottle and was arrested.  Baker and Matthews drove Henderson to the emergency room at Penn Presbyterian Medical Center to receive treatment for her cut finger.  At the hospital, she received an x-ray and was diagnosed with a spiral fracture to the fifth metatarsal of her right foot, a bone near the small toe.

The critical dispute at trial was how Henderson's foot was injured.  Henderson claimed that defendants Matthews and Pinkston pulled her down the steps of 5150 Reno Street, which caused her to fall and fracture her foot.  By contrast, defendants maintained they did not forcibly transport her down the steps.  Matthews insisted that Henderson walked down the steps without incident on her own.  Pinkston did not recall being at 5150 Reno Street that night at all.

Henderson testified at trial.  Her memory of the events of the early morning of February 10, 2018 is sketchy at best.  Indeed, she has no memory of what occurred at the steps at 5150 Reno Street when she was allegedly subjected to excessive force.  She had been drinking since 9 A.M. the day

before and in the process had consumed a half-gallon of rum.
The evidence is undisputed that she was very drunk during the
relevant events in question.

Henderson testified that after her fight with Alisha,
she left her home at 5138 Reno Street and walked a block away to
the intersection of 52nd Street and Haverford Avenue.  At the
time, she experienced no foot pain.  When she returned to the
5100 block of Reno Street, the owner of 5150 Reno Street, Lanett
Parrish, invited her inside to collect herself.  Two officers
entered the house at 5150 Reno Street while Henderson was inside
and beckoned her to the front porch.  She could not remember
their identities.  They walked her to the top of the front steps
with her hands behind her back.  She saw an officer walk up the
street--the same officer who drove her to the hospital--and
yell, "Who did it?"  She felt a pull and then lost
consciousness.  The next thing she remembers is regaining
consciousness at the bottom of the steps.  She yelled in pain,
"Ow."  She heard her son Hughes yell, "That's my mom."  She had
difficulty getting up because she could not place weight on her
right foot.  Officers lifted her under each arm, handcuffed her,
and carried her to the police car.  Roughly eight to ten
officers were standing in the street nearby.  While in the
police car, she heard unidentified officers say, "This is the
one--this is what we're going to say happened," to which she

responded, "No, officer it didn't happen like that."  She could
not remember the drive to the hospital or much of what happened
there.

Henderson's medical records were admitted at trial.
After her arrest, she was taken to Penn Presbyterian Medical
Center.  Her records reflect that when she arrived at the
hospital at approximately 5:30 A.M., she reported only the cut
on her right index finger, which occurred when the wine bottle
broke during her altercation with Alisha.  She did not report
pain in her right foot until later that morning.  At 7 A.M., an
emergency room doctor reported an update in her condition:
"Patient now mentioning right foot pain."  At some point after
Henderson reported her foot pain, an emergency room nurse
reported she was "ambulatory with a steady gait."  Henderson
remembered undergoing an x-ray and being told she had fractured
her foot.  She saw a podiatric specialist at Penn Medicine later
that morning.  A note from that visit reads, "Per patient, she
was in an altercation with her son when she found herself on the
ground with severe foot pain and is unable to bear weight."  Her
records also show that she reported using marijuana that night.

Henderson's son, Ramil Hughes, also testified.  He
recounted that he was upstairs in the shower during the fight
between Alisha and Henderson.  He came downstairs and broke up
the fight sometime after Henderson smashed the wine bottle over

Alisha's head.  Henderson got up and walked out the front door.
She was walking normally.  Hughes tended to Alisha until police
arrived.  When they did, Hughes was upset that Alisha had
returned to 5138 Reno Street and yelled at the officers.
Pinkston handcuffed Hughes and placed him in a police car
outside 5138 Reno Street.  After twenty minutes or so, a police
officer placed Hughes on the curb and interviewed him.  Hughes
heard Parrish, the owner of 5150 Reno Street, call out to the
officers on the scene that Henderson was there.  He said a
supervising officer, then-Sergeant Mustafa Beyah, instructed
Pinkston to cuff him again and then ordered Matthews and
Pinkston to go to 5150 Reno Street.

It was dark as Hughes watched from down the street.  A
porch light illuminated the front of the house at 5150 Reno
Street.  When Henderson exited the house, Matthews was standing
on the steps, while Pinkston was at the bottom of the steps of
the house next-door.  Matthews asked Henderson, "What did you
hit her with?"  Then Henderson descended the steps.  After she
took two steps down, Matthews grabbed her left wrist, and
Pinkston grabbed her right forearm.  Pinkston used "a jerky
motion downward," and Matthews "did a twisting motion taking her
arm behind her back."  Henderson then fell "knees to the ground"
at the bottom of the steps.  She yelled out in pain, "Ouch,"
and, "My foot hurts."  Matthews and Pinkston hoisted her off the

-7-

ground.  She tried to put weight on her foot but could not, and
as a result the officers carried her to the police car.  Her
feet never touched the ground.  Several officers stood in the
street in close proximity, including Beyah, Miller, Rasheed, and
Andrew Smith.  None of the officers was still at Henderson's
home.

Henderson elicited testimony from several officers,
including defendants.  Many of the officers testified they could
not remember who did what that evening.

Matthews gave the following account.  Upon learning
Henderson's whereabouts, he approached the house at 5150 Reno
Street.  Standing inside the doorway were Henderson and Parrish.
Matthews stood in the front doorway of the house as Henderson
exited the house.  He was looking elsewhere when Henderson
descended the stairs and was handcuffed.  He never touched her
while they were on Reno Street.  Matthew rode along as Baker
drove Henderson to Penn Presbyterian Medical Center to receive
treatment for her cut finger.  Henderson walked into the
hospital normally, without assistance.  Matthews first learned
of Henderson's foot injury at the hospital.

Pinkston testified that he did not recall seeing
Henderson at all that night.  He "held the scene" at 5138 Reno
Street, documenting who came in and out of the house.  During
all relevant events he was inside 5138 Reno Street, in the

doorway, or on the front porch, and whatever he saw was from those vantage points.  He never saw or touched Henderson.

Officer Baker testified that when Henderson exited 5150 Reno Street, Matthews was outside on the porch, and Baker stood on the street ten feet away along with Miller and Rasheed. Baker noticed that Henderson's finger was bleeding and wrapped in a towel when she exited the house but that she was walking normally.  Rasheed handcuffed her.  Henderson was searched and then walked to Matthews and Baker's police car.  At the hospital, Henderson got out of the vehicle and walked up the ramp to the emergency room unassisted.

Other officers testified at trial, sometimes contradicting each other.  Smith testified that he was at 5138 Reno Street the entire night but did not recall seeing Pinkston inside the house.  Although other officers testified that Beyah supervised the officers at the crime scene, Beyah testified that he could remember nothing of that night.  Rasheed stated on the witness stand that she was at 5138 Reno Street tending to Alisha and did not see Henderson all night, but other witnesses testified that Rasheed walked toward 5150 Reno Street and was the officer who handcuffed Henderson.

The parties presented conflicting medical expert testimony.  Henderson offered a podiatrist, Dr. David Plotkin. He opined to a reasonable degree of medical certainty that

Henderson's fifth metatarsal fracture was more likely than not caused by her being pulled down the steps at 5150 Reno Street. He explained that such a fracture often occurs when a foot gets twisted and hits the ground hard.  According to Dr. Plotkin, these fractures are incredibly painful and typically cause injured individuals to walk with a noticeable limp.  He concluded that if she had sustained the injury as a result of the fight, she would not have been able to walk normally immediately afterward.

Defendants countered with Michael Troiano, M.D., also a podiatrist.  He opined to a reasonable degree of medical certainty that Henderson's injury occurred during her fight with Alisha when Alisha jumped on her, when she twisted her body to strike Alisha with the wine bottle, or when Hughes pulled her up from underneath Alisha.  In his view, Henderson's intoxication from a half-gallon of rum and her use of marijuana numbed the pain in the immediate aftermath of the fight.  He explained that alcohol is "one of the best anesthetics" and noted that prior to the year 1900, doctors frequently gave liquor to patients before they underwent surgery.  He opined that the painkilling effect of the alcohol Henderson drank, combined with the marijuana she had consumed, allowed her to walk up the block, to the neighbor's house, and then into the hospital.  Only after she sobered up in the hospital did she first experience foot pain.

III

Henderson first argues that she is due a new trial because of newly discovered evidence, namely that certain residents of the 5100 block of Reno Street did not appear as witnesses at trial.  Henderson represents that Lanett Parrish would have testified to "the appearance of the officers who came to her house, contradicted Matthews' testimony, and said [Henderson] walked normally."  Henderson claims that James Child, also a resident of the 5100 block of Reno Street, would have told the jury that Henderson "could not walk and had to be hoisted by police."  Henderson also contends that another neighbor, Saskia Jones, would have stated that she "saw and heard [Henderson] on the ground in front of 5150 Reno Street complaining of pain, police telling her to get up and her saying she could not get up."

Henderson's counsel advised the court he had subpoenaed each of these witnesses to appear on August 11, 12, or 13.  When the court rescheduled the trial to start on August 9 and not on August 11, he asserts he was unable to produce these witnesses.

To obtain relief from a judgment under Rule 60(b)(2) of the Federal Rules of Civil Procedure, the moving party must prove that the new evidence "(1) [is] material and not merely cumulative, (2) could not have been discovered before trial

-11-

through the exercise of reasonable diligence and (3) would
probably have changed the outcome of the trial." <u>Compass Tech.,
Inc. v. Tseng Labs., Inc.</u>, 71 F.3d 1125, 1130 (3d Cir. 1995)
(citation omitted).

 To begin with, Parrish had been deposed during
discovery, and the court permitted Henderson's counsel to read
relevant excerpts into the record.  With respect to Child and
Jones, Henderson's counsel was also well aware of their
purported testimony ahead of trial since he stated he had served
them with subpoenas in advance.  Because their testimony could
not be considered "newly discovered" after trial, Henderson's
motion will be denied on this ground.

 Henderson further appears to move for a new trial
because the court did not order the Marshal to bring Child and
Jones to the trial.  Henderson's counsel asserted he had served
subpoenas on them but could not supply the court with copies of
the subpoenas or other proof that the subpoenas were properly
served on Child or Jones.

 Henderson's counsel offered a process server's
affidavit stating that a woman of unknown relation at Child's
residence accepted the summons.  The court permitted Henderson
to subpoena Jones to attend a deposition four days before trial.
That deposition never happened.  Henderson's counsel could
provide only the process server's affidavit, which stated that

the process server was unsuccessful in serving Jones with a
subpoena for the updated trial date.  Under Rule 45 of the
Federal Rules of Civil Procedure, a subpoena to appear and
testify at trial that has not been personally served on the
subject is unenforceable.  See, e.g., Alfamodes Logistics Ltd.
Liab. Co. v. Catalent Pharma Sols., LLC, Civ. A. No. 09-3543,
2011 WL 1542670, at *1 (E.D. Pa. Apr. 25, 2011).  Because
Henderson supplied insufficient evidence to show that the
subpoenas of Child and Jones were personally served, the court
properly refused to send the Marshal to seize those witnesses.

IV

       Henderson next argues she is entitled to relief from
judgment because the "verdict was based on perjury."  Under
Rule 60(b)(3) of the Federal Rules of Civil Procedure, the court
may set aside a judgment for "fraud" if the moving party shows
that "the adverse party engaged in fraud or other misconduct,
and that this conduct prevented the moving party from fully and
fairly presenting his case."  Stridiron v. Stridiron, 698 F.2d
204, 207 (3d Cir. 1983) (citation omitted).

       Even with a charitable reading of Henderson's motion,
she merely points out minor inconsistencies in the officers'
testimony.  Her counsel cross-examined these officers and
highlighted their perceived inconsistencies during his closing
argument.  The events in question occurred approximately

-13-

three-and-a-half years before this trial.  Any inconsistencies simply do not rise to the level of perjury.  See Ellis v. City of Pittsburgh, 656 F. App'x 606, 610 n.3 (3d Cir. 2016) (citing Montano v. City of Chicago, 535 F.3d 558, 564 (7th Cir. 2008)).[2]

V

Henderson next argues that several of this court's rulings excluding evidence and argument during trial constitute reversible error.  Under Rule 61 of the Federal Rules of Civil Procedure, a ruling excluding evidence is not grounds for a new trial unless it affects a "substantial right of the party." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 400 (3d Cir. 2016) (citation omitted).

First, Henderson asserts she was prejudiced because the court ordered her counsel not to use the phrase "cover-up" in his closing argument to describe police testimony at the trial.[3]  The court has discretion to restrict attorney conduct during closing argument to prevent attorneys from making unfairly prejudicial statements to the jury.  Without evidence

---

2.    In her motion, Henderson also argues the inconsistencies in the officers' testimony constitute "fraud on the court" that warrants relief from judgment under Rule 60(d) of the Federal Rules of Civil Procedure.  Our Court of Appeals has made clear that "perjury by a witness is not enough to constitute fraud upon the court." Herring v. United States, 424 F.3d 384, 390 (3d Cir. 2005).

3.    Henderson claims the court instructed her counsel also not to use the phrase "police corruption."

-14-

that the police witnesses involved in this case conspired to conceal information, such an argument would have been highly prejudicial.  The court properly exercised its discretion to restrict Henderson's counsel only to make permissible arguments about evidence in the record and witness credibility.  See, e.g., Ross v. City of Chicago, Civ. A. No. 13-751, 2014 WL 1344279, at *4 (N.D. Ill. Apr. 3, 2014).  Of course, Henderson's counsel remained free to argue, as he did, that these witnesses were not credible.

Second, Henderson argues that she was prejudiced because the court "allowed counsel for the police to interrupt crucial impeachment evidence" and did not permit her counsel to question Pinkston and Matthews on prior inconsistent statements.  Her motion does not identify these statements or the court's rulings in the record.  Rule 7(b)(1) of the Federal Rules of Civil Procedure, which provides that all motions must "state with particularity the grounds for seeking the order," applies to motions under Rule 59.  Shushereba v. R.B. Indus., Inc., 104 F.R.D. 524, 529 (W.D. Pa. 1985).  Because Henderson's motion does not satisfy the particularity requirement of Rule 7(b)(1), her motion is denied with respect to this issue.

Third, Henderson argues that she was prejudiced because the court barred her counsel from offering what he deems to be impeachment evidence against then-Sergeant Mustafa Beyah.

-15-

During discovery, after Beyah's counsel advised him to leave his deposition, the emergency judge of this court at the time in the absence of the undersigned ordered Beyah's deposition to continue later that day in the judge's courtroom.  At trial, Henderson's counsel sought to impeach Beyah by eliciting testimony from him about this incident.  The court sustained defendants' objection to this line of questioning.

Under Rule 608 of the Federal Rules of Evidence, counsel may only inquire into "specific instances of a witness's conduct . . . if they are probative of the [witness's] character for truthfulness or untruthfulness."  Whether a witness walked out of a deposition is not probative of whether the witness has a character for untruthfulness, particularly when he did so at the initiative of his counsel.  Thus, Henderson's counsel properly was precluded at trial under Rule 608 from asking Beyah about this incident.  Either way, this ruling did not affect Henderson's substantial rights.  Beyah's testimony played a minimal role at trial.  This collateral inquiry into his credibility was tangential at best.

Fourth, Henderson argues that she was prejudiced because the court refused to allow her counsel to question officers on certain Philadelphia Police Department directives. At trial her counsel sought to elicit testimony from the officers on the department's policies on use of force, crime

-16-

scene responsibilities, and investigational reporting duties "to show police did not follow proper procedures regarding the investigation of the injuries to Alisha Henderson and jury [sic] to Plaintiff, which tends to show a motive of cover up."

The directives were properly excluded.  Even if the department directives were relevant, they were excluded under Rule 403 of the Federal Rules of Evidence for the "potential to [mis]lead the jury to equate local policy violations with constitutional violations." McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009).  In any event, excluding the directives did not affect Henderson's substantial rights.  Her counsel had the opportunity to examine the officers and to argue in summation on the officers' use of force and any perceived inconsistencies in their testimony.

VI

Henderson also argues that she is entitled to a new trial because the jury's verdict was against the weight of the evidence.  A jury verdict should not be disturbed unless "the great weight of the evidence cuts against the verdict." Leonard, 834 F.3d at 386 (citation omitted).  Only when the record is devoid of "evidence from which a jury could have rationally reached its verdict" should the jury's verdict be set aside.  Id. (citation omitted).  It is not the court's role to

"substitute its judgment of the facts and the credibility of the witnesses for that of the jury."  Id. (citation omitted).

Put simply, there is ample evidence supporting the jury's verdict.  There was conflicting testimony as to what happened on Reno Street in the early morning hours of February 10, 2018.  Credibility was the province of the jury. It was free to accept Matthews and Pinkston's evidence that they did not forcibly remove Henderson from 5150 Reno Street and that Henderson injured her foot in her fight with Alisha earlier that morning.  It was also free to decide which expert to believe. Henderson essentially argues she is entitled to a new trial simply because her evidence was more believable than defendants' evidence.  The jury properly weighed the conflicting evidence and made credibility determinations that this court will not second-guess.

VIII

Plaintiff Helen Henderson is not entitled to relief. No miscarriage of justice has occurred and no extraordinary justifying circumstances are present.  The motion of Henderson for a new trial and for relief from judgment will be denied.

-18-